UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHESTER PARK VIEW, LLC, and LAZAR OSTREICHER<br><br>                    Plaintiffs,<br><br>          v.<br><br>BEN SCHLESINGER, MARVIN LIPSCHITZ, a/k/a MARVIN LIPSHUTZ, MORDECHAI BECK and MEIR BERGER<br><br>                    Defendants. | Case No. 23-cv-5432 (CS)<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Chester Park View, LLC ("CPV") and Lazar Ostreicher ("Rabbi Ostreicher" and together with CPV, "Plaintiffs"), by their attorneys Reiss Sheppe LLP, for their First Amended Complaint avers the following upon personal knowledge as to their own acts and status and upon information and belief as to the acts and status of all others:

## INTRODUCTION

1.   This Civil Rico Action is being brought to prevent Defendant Mordechai Beck ("Beck") from holding certain real property – located at 38 College Road, Monsey, New York (the "Property") – and the religious corporation that has been there (Anshei Sfard Monsey ("ASD")) for more than 20 years -- hostage from its community resulting in the Property being unused by any congregation and requiring Rabbi Ostreicher – who now rightfully controls the Property and ASD -- to minister to his 100 person strong congregation in the basement of his house.

2.   Defendants' Ben Schlesinger ("Schlesinger") and Marvin Lipschitz ("Lipschitz") (who had controlled the Property as its mortgagors and ASD as its trustees) are complicit in this scheme as at the same time Schlesinger and Lipschitz sold control over the Property to CPV and ASD to Rabbi Ostreicher, they were working with Beck to give Beck control over both the

Property and ASD.  That is, even after selling control over the Property and ASD to Plaintiffs, Schlesinger and Lipchitz worked to give control of the Property and ASD to Beck.

3.   Moreover, Schlesinger and Lipschitz in conjunction with Beck and Defendant Meir Berger ("Berger"), created numerous forged documents to support Beck's fictitious claims to the Property and ASD.

4.   But, ASD has no congregation at all.  It has no members.  ASD has no bank accounts, no operating documents, no real congregation.  Its sole purpose is to act as a vehicle for the Defendants to manage and maintain control over the property where ASD is purportedly located.

5.   And, Beck's connection to the Property is limited to his busing students from a school in Brooklyn to be taught in a more rural setting, for which Beck obtains Federal funding, at least some of which funding has gone to Schlesinger and Lipschitz.

6.   Beck's scheme is designed to give him sole control over the Property to the exclusion of CPV and Rabbi Ostreicher who rightfully control it.  As a result of this scheme, CPV, who legitimately purchased the note for the Property cannot exercise its rights with respect to the note.  And Rabbi Ostreicher, who, among others, is now a rightful trustee of ASD cannot pray at the Property, instead requiring him to renovate his house just to allow his 100-person strong congregation a place to meet.

## JURISDICTION AND VENUE

7.   This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §1964 and supplemental jurisdiction pursuant to 18 U.S.C. § 1367(a) over Plaintiff's state law claims.

8.   Venue is proper in this judicial district pursuant to 18 U.S.C. §1965 and 28 U.S.C. § 391 because Defendants Schlesinger, Lipschitz, Beck and Berger are subject to personal jurisdiction in this judicial district and reside in this judicial district.

**PARTIES**

9.   Plaintiff Chester Park View, LLC is a Delaware limited liability company with its principal place of business located in Spring Valley, New York.  CPV's members are citizens of New York State.

10. Rabbi Lazar Ostreicher is an individual residing at 11 Cucolo Lane, Monsey, New York 10952.

11. Defendant Ben Schlesinger is an individual residing at 173 Grandview Avenue, Monsey, New York 10952.

12. Defendant Marvin Lipschitz is an individual residing at 24 Dolson Road, Monsey, New York 10952.

13. Defendant Mordechai Beck is an individual residing at 40 Wallenberg Cir., Monsey, New York 10952.

14. Defendant Meir Berger is an individual residing at 15 Eagle Street, Spring Valley, New York 10977.

**FACTUAL ALLEGATIONS COMMON TO ALL RICO COUNTS**

**Creation of ASD and ASD, Inc.**

15. Anshei Sfard D'Monsey, Inc. ("ASD Inc.") was formed pursuant to §403 of the Business Corporation Law of the State of New York, as a domestic for-profit corporation on October 23, 1995.

16. On November 2, 1995, ASD Inc. purchased the Property from Paula Morabito.

17. ASD is a supposed not-for-profit, religious corporation organized and existing under and by virtue of Article 10 of the Religious Corporations Law of the State of New York, formed on November 2, 1995.  As noted later herein, ASD has no congregation and is used simply to maintain control over the Property.

18. ASD's certificate of incorporation lists its initial trustees as: i) Joshua Berger; ii) Sam Halperin; iii) Aaron Halpert; iv) Joshua Friedman; and v) Ben Schlesinger.

19. On December 23, 1996, ASD Inc. conveyed the Property to ASD.  The deed conveying the Property was executed by Ben Schlesinger, as President of ASD Inc.

20. As part of that same transaction, on December 23, 1996, ASD granted a promissory note and mortgage on the Property to ASD Inc. and Defendant Ben Schlesinger in the amount of $92,000.00 at ten percent (10%) interest per year (the "ASD Note").  The ASD was executed by Marvin Lipschitz, as Secretary of ASD at the time.

21. On January 16, 1998, Sam Halperin resigned as a trustee of ASD and was not replaced by the board of trustees.

22. On March 9, 1998, Aaron Halpert and Joshua Berger resigned as trustees of ASD and were not replaced by the Board of Trustees.

23. Subsequently, Joshua Friedman passed away and, by operation of law, was no longer a trustee of ASD, nor was he replaced by the board of trustees.

24. So, as of January 1, 2002, the sole remaining ASD trustees were Marvin Lipschitz and Ben Schlesinger, who remained the sole ASD trustees through December 23, 2021.

**Beck Buses Students from His Brooklyn Congregation to ASD**

25. In early 2000 (and perhaps earlier), Beck began busing students from Brooklyn, New York to ASD for purposes of teaching the religious students in a more rural teaching setting. Beck has done this on and off for a period of years.  Beck obtained federal funding to pay for the busing and to pay ASD for the use of the Property for his students.

26. Beck has conducted this schooling through his school in Brooklyn, New York.  Beck has no actual connection or affiliation and has never had any connection or affiliation with ASD at all.  He merely used ASD's Property for his students from his own Brooklyn school.

**Chester Park View Purchases the ASD Note**

27. Schlesinger and Lipschitz had been using the Property to hold informal prayer sessions over the past approximately twenty years, as Schlesinger lived right near the Property.  But, ASD is not and was not a formal congregation during this time period. And these prayer sessions were in no way affiliated or connected to ASD.

28.  As Schlesinger was moving across town, i.e., further away from the Property, he informed Ben Gross, who also lived near the Property and had informally prayed there with Schlesinger and Lipschitz for many years, in or about September 2021 that he was interested in selling the ASD Note and giving up control of ASD.  Again, since 2002, Schlesinger and Lipschitz had been the only two trustees of ASD and also held the mortgage for Property and so had total control over ASD.

29. At this time, because Beck had been using the Property on and off for a number of years, Gross spoke with Beck to see if he would be interested in buying out Schlesinger's stake in the ASD Note and taking control over the Property.

30. Beck told Gross that he had no interest in purchasing the ASD Note.

31. Gross informed Rabbi Ostreicher that Schlesinger and Lipschitz were looking to sell, and Rabbi Ostreicher, Schlesinger and Lipschitz began conversations concerning the purchase and sale of the ASD Note and transfer of control over ASD.

32. The reason Rabbi Ostreicher was so interested in purchasing the ASD Note and taking control over ASD was because he had approximately 100 congregants from his own congregation, Lev Yisrael, about 20-30 of whom were already informally praying at the Property, and was looking for property to house his congregation.

33. Rabbi Ostreicher, also aware of Beck's use of the Property, had a similar conversation with Beck as Gross did around this same time.  And, Beck also told Rabbi Ostreicher that he had no interest in purchasing the ASD Note or taking control of ASD.

34. Accordingly, Rabbi Ostreicher moved forward with his negotiations with Schlesinger and Lipschitz to purchase the ASD Note and take control of ASD. This was accomplished in two transactions.

**Rabbi Ostreicher is Elected Trustee of ASD**

35. On December 23, 2021, and as part of the transaction between Rabbi Ostreicher, Schlesinger and Lipschitz, at a special meeting of the rightful trustees of ASD -- Schlesinger and Lipschitz –Lazar Ostreicher, Chaim Stern, Ben Gross and Malka Ostreicher were elected as trustees of ASD. This action was duly filed to officially show the change in trustees.

36. Thus, as of that date, Lazar Ostreicher, Chaim Stern, Ben Gross and Malka Ostreicher were the trustees of and in control of ASD and Schlesinger and Lipschitz were resigning as trustees.  Also as of that date, no other documents had been filed to even suggest otherwise.

37. Indeed, on December 10, 2021, Schlesinger emailed Rabbi Ostreicher providing documents confirming that Schlesinger and Lipschitz were the only two remaining trustees of ASD, attaching various resignation letters from previous trustees.

38. As part of this transaction process, Schlesinger emailed Rabbi Ostreicher and others many times between December 10, 2021 and at least May 2022, including on January 2, 2022 concerning further documenting the transaction with Ostreicher, including an email from February 11, 2022 from Schlesinger to Rabbi Ostreicher asking for revisions to certain transaction documents to reflect payments that would be made to Schlesinger, and including a chain of related emails dating back to December 24, 2021.

**CPV Purchases the ASD Note**

39. The second transaction was the sale of the ASD Note, which occurred on May 5, 2022, as memorialized in an assignment of mortgage executed by CPV, ASD Inc., Schlesinger and Lipschitz.

40. On May 5, 2022, Lipschitz participated via Zoom from Florida and signed the necessary documents where he was located.

41. Pursuant to the transaction, Schlesinger and Lipschitz assigned the ASD Note to CPV (a copy of the Agreement is attached hereto as Exhibit 1).

42. The terms of the contract included representations by Schlesinger and Lipschitz that:

    a. Schlesinger and Lipshutz are presently the sole shareholders, officers and directors of ASDM [ASD Inc.];

    b. Schlesinger and Lipshutz are presently the sole Trustees of the Congregation [ASD];

7

    c.   ASDM is a duly formed corporation in good standing in its place of domicile;

    d.   The execution of this Agreement is fully authorized by ASDM on its own behalf and on behalf of all persons acting by, through or under ASDM and that no other corporation authorization of any kind is necessary to make the execution of this Agreement binding on ASDM;

    e.   Schlesinger and Lipshutz have the necessary and appropriate authority to do so from ASDM effective to bind ASDM;

    f.   There are no pending agreements, transaction or negotiations to which ASDM is a party that would render this Agreement or any part thereof void, voidable or unenforceable.

43. CPV performed under the contract by paying the $525,000 that it was required to pay under the contract by May 5, 2022.  As no interest payments had been made on the ASD Note, as of May 5, 2022, the outstanding balance due on the ASD Note was approximately $1.1 million.

44. Moreover, Schlesinger and Lipschitz's lawyer, David Ascher confirmed his clients' participation in the transaction in a May 13, 2022 email to Ted Mozes, Rabbi Ostreicher's transactional attorney, when Ascher noted that he was "meeting with my clients this morning…[l]ooking forward to finishing this and releasing the funds today".

**Beck Decides He Wants To Buy the Note**

45. Even while Schlesinger and Lipschitz were selling the ASD Note to CPV and control over ASD to Rabbi Ostreicher, Beck, Schlesinger and Lipschitz were working to cement Beck's control over ASD.

46. Rabbi Ostreicher learned after the May 5, 2022 transaction, when Rabbi Ostreicher was in Israel, of Beck's claimed "sudden" interest in the Property and sought to have the entire matter resolved through Rabbinical court.  To this end, Rabbi Ostreicher was communicating with a Rabbinical court trying to confirm that Beck would participate.  Beck was able to use his influence to have the Rabbinical court purposely mislead Rabbi Ostreicher to better enable Beck to control the Property.

47. To that end, while Rabbi Ostreicher was in Israel, Beck had Rabbi Blum, from the Rabbinical court Rabbi Ostreicher was trying to use to resolve the dispute – Machon L'Hora - and who Beck knew Rabbi Ostreicher trusted, purposely mislead Rabbi Ostreicher by telling Rabbi Ostreicher, by email on May 11, 2022, not only that Beck had agreed to have the Rabbinical court resolve things, but also that Rabbi Ostreicher should fire his civil lawyer because there would be no need for him.

48. When Rabbi Blum told Rabbi Ostreicher that Beck had agreed to go to Rabbinical court, Rabbi Blum knew full well that Beck was in the process of finalizing his civil complaint against Rabbi Ostreicher and that Beck never had any intention of going to Rabbinical court to resolve this.  Since this happened, Rabbi Blum has repeatedly tried to get Rabbi Ostreicher to forgive him for his duplicity and indicated he would do whatever he could to make things right, although to date, he has done nothing in this regard.

49. But, Beck never had any intention of going to Rabbinical court to resolve things – which Rabbi Blum well knew, as while he was misleading Rabbi Ostreicher about his intentions to honorably resolve things, Beck himself, was preparing and ultimately filed an action in New York State Court.

9

50. Consistent with his duplicity and chicanery throughout, Beck filed suit and sought a temporary restraining order on Friday, May 13, 2022, after the Sabbath had already begun in Israel, knowing full well that Rabbi Ostreicher i) was not anticipating the lawsuit because he had been misled into thinking Beck was going to Rabbinical court; and ii) would not be able to respond to the temporary restraining order as the Sabbath had already begun.

**Schlesinger and Lipschitz Sell the Note to Beck**

51. Around that same time, Schlesinger advised Ben Gross that he would sell the ASD Note to whichever of Rabbi Ostreicher and Beck would pay him the most money.

52. Schlesinger made this statement to Ben Gross on or about May 9, 2022 during a phone call between the two of them.

53. This fact was confirmed on or about March 14, 2023.  For some time, Rabbi Ostreicher had been attempting to have the dispute resolved by Bais Din, but Schlesinger and Beck refused.

54. As part of that process, at an appearance at a Bais Din in Monsey, before Rabbi's M. Babaed, Ay Branstein and M. Flieshmen, Beck's assistant, Berger, appeared to determine if Beck had to actually appear before the Bais Din.

55. At this appearance before the Bais Din, Berger specifically told Rabbi Ostreicher that Beck had paid Schlesinger and Lipschitz more than Rabbi Ostreicher had which is why they were claiming the Property.

56. Berger confirmed it yet again, on June 14, 2023, when he advised Rabbi I. during a conversation with him that Rabbi Ostreicher was the rightful owner of the Property, but Berger believed that Beck's control of the Property would allow Berger to access funding and do

whatever he wanted in the future given the help he provided to Beck in taking the Property from Rabbi Ostreicher.

**Schlesinger, Lipschitz and Beck Commit Fraud in Furtherance of Their Scheme**

57. In order to bolster Beck's claim to control over ASD and the Property, Schlesinger, Lipschitz, Berger and Beck began to commit a series of fraudulent acts all designed to take the Property from Rabbi Ostreicher and vest control over the Property and ASD in Beck.

58. Chief among these acts was the creation of various fraudulent documents created to support Beck's fictitious claims to the Property.  Among these fictitious documents were the following:

*Fraudulent Meeting Minutes- January 1, 2003*

59. Beck, with Berger's assistance created the "Fraudulent Meeting Minutes" (attached hereto as Exhibit 2) which purport to be meeting minutes of the members and trustees of ASD that supposedly took place on January 1, 2003.

60. No such meeting or vote ever took place on January 1, 2003 (or any other day). Moreover, none of purported names on the Fraudulent Meeting Minutes, Joshua Sternhell, Larry Lipschitz, Rabbi Mordechai Beck, Flora Beck, Elky Friedman or Rachel Klein were ever elected or appointed as trustees of ASD.

61. In fact, only Marvin Lipschitz and Ben Schlesinger were Trustees of ASD at that time, and neither of them ever attended a meeting on January 1, 2003 or participated in any vote (on any date) where any of the aforementioned persons were elected or appointed as trustees of ASD.

62. The Fraudulent Meeting Minutes were never previously filed to show that the meeting had occurred and that the supposed trustees listed in the Fraudulent Meeting Minutes were valid.

11

No details about the supposed "meeting's" compliance with Article 10 of the Religious Corporation Law for the State of New York are described. There is no mention of the number of members present, nor any description of the notice requirements being fulfilled in order for the appointment to be valid.

63. Finally, the Fraudulent Meeting Minutes – from 2003 -- appear to be in perfect condition for a document that is almost 20 years old, and the signatures on the documents are perfectly aligned with the space provided, suggesting they were not natural signatures.

64. In 2003, documents were not typically signed electronically, which is how these signatures appear. The individuals alleged to have signed this document all have signatures that are readily accessible electronically now such that piecing them together on a document would not be difficult.

***Fraudulent Certificate***

65.    On April 29, 2022, Morcha Beck filed what purported to be an "Amended Certificate of Incorporation" of ASD (the "Fraudulent Certificate", attached hereto as Exhibit 3) which upon information and belief was created by Berger at Beck's direction.

66.    The Fraudulent Certificate was false, self-serving, never authorized to be filed by ASD's actual Board of Trustees or any of its officers, and was not compliant with Article 10 of New York's Religious Corporations Law.

67.    Morcha Beck, who apparently filed the Fraudulent Certificate, was never a trustee or officer of ASD.  In fact, it is unclear whether Morcha Beck is an actual person, or just a made-up name for Beck or one of Beck's relatives.

68.     The Fraudulent Certificate asserted that, at a purported meeting on January 1, 2003, the following individuals were "elected" as trustees of ASD: Marvin Lipschitz, Ben Schlesinger, Joshua Sternhell, Larry Lipschitz, Rabbi Mordechai Beck, Flora Beck, Elky Friedman, and Rachel Klein.

69.     No record of this alleged meeting or any resolution that would substantiate this claim was ever filed.

70.     The Fraudulent Certificate, signed only by Beck, Rachel Klein and Elky Friedman, purports that a meeting of the trustees took place on March 15, 2022. During the alleged "meeting," Beck, Elky Friedman, Rachel Klein, Flora Beck, Naftali Beck, Ben Schlesinger, Marvin Lipschitz and Lipschitz were purportedly "elected" as trustees of ASD.

71.     Neither Ben Schlesinger nor Marvin Lipschitz, the actual trustees of ASD, were present for any meeting on March 15, 2022, nor were either of them ever asked to (nor agreed to) become a trustee of ASD after their resignations in December of 2021.

72.     Indeed, when Ben Schlesinger nor Marvin Lipschitz resigned as Trustees in December of 2021, the only remaining trustees of ASD were Lazar Ostreicher, Chaim Stern, Ben Gross and Malka Ostreicher (whom Ben Schlesinger and Marvin Lipschitz had appointed prior to their resignations).

73.     The self-serving Fraudulent Certificate sought to authorize the inclusion of additional trustees, while the only signatories to the Fraudulent Certificate were the three additional trustees supposedly elected. An individual who had no authority to appoint anyone as a trustee, let alone themselves, cannot simply file a document stating that they are now a trustee and appoint themselves as officers.

13

74.     The Fraudulent Certificate also contains many statements that tend to show its lack

of authenticity, and incompatibility between sections. Section 1(c) states that ASD shall

maintain eight trustees. However, Beck is appointed to supposedly fill two spots, taking over

for a deceased individual who was allegedly a trustee, and with Flora Beck designated to take

over the trustee positions of Ben Schlesinger and Marvin Lipschitz should their spots become

vacant, thereby giving her three trustee spots.

75.     Also, the terms that the trustees are to fill are not consistent as they have different

dates that range from less than one year, two that are listed as one year, and the remainder set at

three years. Although the Fraudulent Agreement states that 1/3 shall have annual renewals, the

dates for the terms of the purported trustees are not consistent.

76.     The Fraudulent Certificate is further shown to be self-serving and suspect as the four

new members added who are Beck and his associates, Elky Friedman, Rachel Klein, Flora

Beck, Naftali Beck, have very different verbiage in their descriptions under Section 2 of the

Fraudulent Document. These names appear to have normal verbiage whereas subsections F and

G, that concern Ben Schlesinger and Marvin Lipschitz, add a qualifier stating that they are a

trustee "only to the extent to which the law deems him a member."  This language demonstrates

that there was an ulterior motive to call into question the legitimacy of these two trustees, who

had been legitimate trustees since the creation of ASD until their resignation in connection with

the CPV transaction.

77.     Additionally, the Fraudulent Certificate does not even comply with Article 10 of the

Religious Corporations Act. Section 198 for the State of New York states, "Two of the trustees

of an incorporated church, to which this article is applicable, may call a meeting of such

trustees, by giving at least twenty-four hours' notice thereof personally, or by mail to the other trustees."

78.    No such notice was provided to the alleged trustees listed in the document of such meeting. More importantly, no notice was provided to the *on-record*, trustees, i.e., Lazar Ostreicher, Chaim Stern, Ben Gross and Malka Ostreicher. No quorum was present as none of the valid trustees were present at the meeting.

79.    Additionally, Beck, Elky Friedman, Rachel Klein, Flora Beck did not demonstrate in the Fraudulent Certificate that they complied with the requirements for electing trustees, or filling vacancies. In the Fraudulent Certificate, Beck appoints himself as the replacement to fill the vacancy left by the passing of Joshua Sternhall.

80.    First, it is ridiculous to assert that a supposed existing trustee could fill two spots. Second, Beck, Elky Friedman, Rachel Klein, and Flora Beck had no authority to nominate themselves or others as trustees. Finally, it is self-serving and bad faith for a signatory to appoint himself, particularly without the consent of all trustees, and the members of the congregation.

81.    It is clear that the Fraudulent Certificate does not fulfill the requirements necessary to fill trustee spots. Article 10 of the Religious Corporations Act. Section 199 for the State of New York further states, "If any trustee of an incorporated church to which this article is applicable, declines to act, resigns, or dies, or having been a member of such church, ceases to be such member, or not having been a member of such church, ceases to be a qualified voter at a corporate meeting thereof, his office *shall be vacant, and such vacancy may be filled by the remaining trustees* until the next annual corporate meeting of such church, at which meeting the vacancy

shall be filled for the unexpired term." (emphasis added).

82.     The Fraudulent Certificate only contains the signatures of three people, and according to it there are seven living trustees. The Religious Corporation Act clearly requires that the trustees all elect how to fill the vacancy. Since there is no documentation that the other alleged trustees signed off on the filling of these vacancies besides the four who appoint themselves as officers, and appoint Beck, the Fraudulent Certificate is not valid.

83.     Finally, it is an odd position to say the least for ASD to have filed the Fraudulent Certificate appointing certain trustees that supposedly were already appointed in the unfiled Fraudulent Meeting Minutes from 2003, after 19 years had passed between the two documents. The Fraudulent Certificate essentially undermines the validity of the Fraudulent Meeting Minutes and demonstrates a lack of truthfulness, diligence and credibility on the part of Beck, Elky Friedman, Rachel Klein, and Flora Beck.

*Fraudulent Agreement- 3/13/2002*

84.     Beck, with Berger's assistance, also created a March 13, 2002 document (the "Fraudulent Agreement", attached hereto as Exhibit 4) that purports to establish that Beck had already purchased 50% of the Property from Schlesinger and Lipschitz in 2002 with an option to purchase another 50% within the next two years, that suddenly after the ASD Note was sold to CPV, miraculously was extended 20 additional years so as to still be a valid option.

85.     At the outset, it is important to note that this Fraudulent Agreement was not entered into by the parties alleged to have signed the document and one of the signatories, Joshua Sternhell was not even a trustee and therefore was not authorized to enter into any contract on behalf of ASD. Additionally, the Fraudulent Agreement is self-serving to Beck thereby

delegitimizing its authenticity, as it offers little to no incentive that would tend to explain why the Board of Trustees would enter into such a one-sided contract.

86.     There is also no evidence offered that Beck fulfilled the conditions precedent that would trigger the fifty percent ownership stated in the Fraudulent Agreement. Further, Beck has also not fulfilled certain provisions of the Fraudulent Agreement and would therefore be in breach if it were actually a legitimate contract. Moreover, there is no record that the members of the congregation at the time approved this Fraudulent Agreement nor evidence that it complies with the Religious Corporation Act making it unenforceable and void.

87.     First, the Fraudulent Agreement was never approved by the then-existing Board of Directors, nor are the signatures on the document legitimate. The signatures clearly have discrepancies that call into question their validity.

88.     For example, in the signature that purports to be Ben Schlesinger, there is a clear break or space in the signature that is interrupted by the purported signature of Marvin Lipschitz. Additionally, Marvin Lipschitz's signature crosses over that of Joshua Sternhell. All of the signatures appear to be perfectly aligned with the space provided for them to sign the document, much like the Fraudulent Meeting Minutes, making them suspect.

89.     The Fraudulent Agreement also supposedly contained the signature of Joshua Sternhell despite the fact he would have had no authority and no business signing any Agreement on behalf of ASD. Indeed, ASD has never provided any documentation in the New York State Action showing that Joshua Sternhell was ever elected as a trustee or had any authority to bind ASD in contract.

90.     Second, the Fraudulent Agreement is completely self-serving to Beck. Clearly, Beck would have an incentive to provide this document, that is suspect and forged, to the Court because the terms are primarily to the benefit of Beck.

91.     The Fraudulent Agreement, in paragraphs seven and eight, states that Beck shall not be required to pay rent but shall receive all donations and contributions of any sort and that Beck will have "sole and exclusive authority with regard to all decisions regarding the religious operations and activities of the congregation." Not only is this a violation of the Religious Corporations Act as described below, but it essentially would strip the trustees of any ability to perform their designated tasks and carry out any business on behalf of ASD.

92.     There is essentially zero incentive for Beck to pay the remaining $425,000 specified in the Fraudulent Agreement as he would effectively have eliminated any and all authority of the trustees from the outset regardless of whether he pays the reminder or not.

93.     The Fraudulent Agreement states that Beck had paid $206,333.00 as of the date the Fraudulent Agreement was allegedly entered into with the Board of Trustees. However, there is no evidence that has been submitted in the New York State Action that the remaining $43,667 required to be paid by March 15, 2002 was in fact paid.

94.     Nor did ASD provide any evidence that the $206,333 was paid into escrow as of the date of the Fraudulent Agreement, nor any proof that the funds were ever released to ASD.

95.     Paragraph three of the Fraudulent Agreement specifically states that it is only upon the payment of the full $250,000 that Beck would get a fifty percent ownership interest in ASD.

96.     Since Beck did not demonstrate that he fulfilled his obligation to pay the remainder of the initial $250,000 (let alone any portion of it), he cannot prove that the Fraudulent

18

Agreement was ever an enforceable contract, even if it is legitimate.

97.    Additionally, Beck did not show that the Note and Mortgage were secured as required by paragraph two of the Fraudulent Agreement. Unless he can demonstrate that both of these conditions' precedent were met, there is no contract for the Court to enforce and it is clear that Beck would have no ownership interest in ASD even according to this self-serving Fraudulent Agreement.

98.    Fourth, Beck provided no evidence that he fulfilled his obligations under the Fraudulent Agreement, even if the conditions' precedent were fulfilled. For instance, Paragraph nine states that Beck shall be responsible for all bills, invoices, and expenses of any sort incurred after the date of the Fraudulent Agreement.

99.    However, Rabbi Ostreicher has paid numerous expenses on behalf of ASD, including property insurance, security for the Property, landscaping, and have paid all fees associated with the overall maintenance of the Property apart from only the bills necessary to serve Beck's self interest in using the inside of the property as a tenant would.

100.    Fifth, Beck did not follow the guidelines of the Fraudulent Agreement but seeks to draw from the benefits outlined therein. Paragraph Twelve states that any disagreements between the parties to the Fraudulent Agreement shall resolve their dispute through binding arbitration by the Rabbinical Court of Mechon Hahoyroa. Responding Defendants do not seek to enforce this provision since it is not their belief that this Fraudulent Agreement is legitimate or enforceable. However, Beck insists in his Affirmation that the Fraudulent Agreement is legitimate, yet ignores key obligations and provisions located therein.

19

101.    Sixth, the Fraudulent Agreement does not comply with the Religious Corporation Act because there is no evidence that the members of the congregation at the time voted to adopt the terms. Article 10, Sections 194 and 195 as well as Article 2 Section 5, of the Religious Corporation Act clearly outline that the congregation must vote to approve transfers of ownership interests proposed by trustees in addition to the notice requirements laid out in the same statutes.

102.    Beck provides no evidence that the Trustees approved this Agreement in their minutes, that the congregation was given proper notice, nor that the congregation voted and approved of the decision to adopt the Fraudulent Agreement. Without proof that these procedures and regulations were followed, the Fraudulent Agreement should not be enforced.

103.    Additionally, as discussed above, the Fraudulent Agreement bypasses the full intent and spirit of the Religious Corporations Act by appointing Beck as the sole recipient of funds, and the sole decision maker for the congregation.

104.    Finally, both Lipschitz and Schlesinger executed the Assignment of Mortgage with CPV in which they both represented that there were no prior agreements such as the Fraudulent Agreement.  Yet, somehow, mere days after they sold the Property to CPV, they suddenly – in conjunction with Beck and Berger – managed to remember that they had in fact executed a 2002 agreement in which they sold 50% of the Property to Beck.  At best this is outright fraud.

105.    Combined with the fact that as part of Rabbi Ostreicher's attempt to resolve this dispute before the Rabbinical court, he specifically asked Berger to provide him with any documents that actually established Beck's ownership interest in the Property.  Berger professed he would provide Rabbi Ostreicher with such a document for weeks, but never

provided one.  Instead, the Fraudulent Agreement magically appeared for the very first time, attached to the complaint Beck filed through ASD against Rabbi Ostreicher in New York State Court and clearly was created just a short time before then.

106.    Each of the above points are independent reasons why the Fraudulent Agreement should not be found to be legitimate and should be unenforceable and therefore void.

***Satisfaction of Mortgage***

107.       On or about July 13, 2022, Schlesinger executed a satisfaction of mortgage on behalf of himself and ASD Inc. of the ASD Note  -- the very same note he had sold to CPV just over two months prior – further assisting Beck and the enterprise with the attempted to transfer of control over ASD and the Property to Beck and his cronies, which note was filed with the County Clerk in Rockland County.

108.       Defendants have used these fraudulent documents not only in a New York State Court proceeding, but they have filed them with the Rockland County Clerk and it is clear by their conduct that they will continue not only to offer these fraudulent documents to further their misconduct, but they will also create whatever documents they believe may be necessary to achieve the Enterprise's goal of taking the Property from Plaintiffs.

***Beck Has Continually Asserted Improper Control Over ASD to the Exclusion of Rabbi Ostreicher***

109.    Over the past twenty years, Beck has repeatedly prevented others from entering the Property as part of his enterprise to take control over the Property and ASD.  This has included refusing to let health inspectors enter the Property, and more generally changing the locks to the Property so that others may not access it.

110.    More specifically, Beck refused entry to the Property by health inspectors on or about August 20, 2021 and refused entry for inspectors to repair open gas lines on May 18, 2022.

111.    Right now, aside from the times when Beck's students are at the Property, the Property sits empty and is being used by no one at all, while Rabbi Ostreicher has to force 100 people to find space in his basement just to pray.  *See Exhibit 5, pictures from Rabbi Ostreicher's basement.*

112.    Beck's continued forced involvement with ASD is detrimental to Plaintiffs' rights to the Property and control over ASD (along with the other trustees properly elected by Schlesinger and Lipschitz).

### FIRST CLAIM
(Federal Civil RICO, 18 U.S.C. §1962(c))

113.    Plaintiffs incorporate by reference all of the preceding paragraphs as if more fully set forth herein.

114.    The first claim is against all of the Defendants.

115.    ASD is an enterprise engaged in and whose activities affect interstate commerce.

116.    The Defendants are associated with this enterprise.

117.    The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.  Specifically:

    a.   Schlesinger and Lipschitz intentionally made false representations to CPV and/or Rabbi Ostreicher that they knew were false at the time that:

        i.   They were the sole shareholders, officers and directors of ASD Inc.;

22

     ii.   They were the sole Trustees of ASD;

    iii.   They had the necessary authority to enter into the contract with CPV and the transaction was authorized by ASDM;

    iv.   There were no other agreements or transactions that would render the contract with CPV, or any part thereof, void, voidable or unenforceable;

b.  Defendants Schlesinger and Lipschitz closed on the sale of the ASD Note even though they did not intend to actually comply with their contractual obligations, which closing took place over Zoom while Lipschitz was in Florida and Rabbi Ostreicher was in Israel.

c.  Defendants created and transmitted electronically the Fraudulent Meeting Minutes;

d.  Defendants created and transmitted electronically the Fraudulent Certificate;

e.  Defendants created and transmitted electronically the Fraudulent Agreement;

f.  Schlesinger's executed of the Satisfaction of Mortgage after already having sold the Mortgage to CPV and filed it with the County Clerk's office;

g.  Defendants used the Property and ASD under the shield of New York's Religious Corporation Law, even though there was no congregation, no bank account for ASD and no operating documents for ASD.

h.  Beck and Berger had Blum email Rabbi Ostreicher in Israel multiple times the week of May 11, 2022 to mislead him about Beck's participation in Rabbinical Court.

118.      These acts were undertaken by means of wire fraud in violation of 18 U.S.C. §1343.

119.      The Defendants knew these actions were fraudulent when they took them and they took them for the purpose of advancing their scheme and the enterprise.

**Predicate Acts**

120.      Schlesinger's and Lipschitz's execution of the contract with CPV while over Zoom, while Lipschitz was in Florida, constitutes a predicate act and wire fraud.

121.      Defendants' creation and electronic transmission of the Fraudulent Meeting Minutes constitutes a predicate act and wire fraud;

122.      Beck's creation and electronic transmission of the Fraudulent Certificate constitutes a predicate act and wire fraud;

123.      Defendants' creation and electronic transmission of the Fraudulent Agreement constitutes a predicate act and wire fraud;

124.      Schlesinger's execution and filing of the Satisfaction of Mortgage constitutes a predicate act and wire fraud;

125.      Defendants used the Property and ASD under the shield of New York's Religious Corporation Law, when there was no congregation, no bank account for ASD and no operating documents for ASD are predicate acts.

126.      Defendants' direction to others, in particular, Blum, to email Rabbi Ostreicher while Rabbi Ostreicher was in Israel to mislead him about Beck's willingness to participate in the Bais Din was a predicate act of wire fraud.

127.     Defendants have each directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

128.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property in that it has no control over the Property that it purchased and so has obtained no benefit from that purchase, but no longer has the money it used for that purchase.

## SECOND CLAIM
(Federal Civil RICO, 18 U.S.C. §1962(d))

129.     Plaintiffs incorporate by reference all of the preceding paragraphs as if more fully set forth herein.

130.     This claim is against each of the Defendants, all of whom, at all relevant times, are and have been a "person" within the meaning of 18 U.S.C. 1961(3).

131.     As set forth in the first claim, Defendants agreed and conspired to violate 18 U.S.C. § 1962 (c).

132.     18 U.S.C. §1962(d) makes it a violation for any person to violate any provisions of 18 U.S.C. § 1962 (a), (b) or (c).

133.     The Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes

25

described above, which conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), which is a violation of 18 U.S.C. §1962(d).

134.     As a direct and proximate result of the Defendants conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that it has no control over the Property that it purchased and so has obtained no benefit from that purchase, but no longer has the money it used for that purchase.

**THIRD CLAIM**
(Breach of Contract by CPV against Schlesinger and Lipschitz Seeking Specific Performance)

135.     Plaintiffs incorporate by reference all of the preceding paragraphs as if more fully set forth herein.

136.     CPV, Schlesinger and Lipschitz entered into an agreement whereby Schlesinger and Lipschitz agreed to sell the ASD Note to CPV for $525,000.00.

137.     CPV performed its obligations pursuant to the terms of that agreement by placing the $525,000.00 with the escrow agent as required by that agreement.

138.     Schlesinger and Lipschitz refused to perform their obligations pursuant to that agreement in that they refused to sign the documents required by the escrow agent to release the funds paid by CPV, thereby leaving the funds and the note in escrow.

139.     Schlesinger and Lipschitz are obligated under the terms of that agreement to execute the document requested but have refused in breach of that agreement.

140.     CPV has been damaged by Schlesinger and Lipschitz's breach of the agreement in that it has been deprived of their ownership of the ASD Note and control over the Property.

26

141.      CPV demands that Schlesinger and Lipschitz be ordered to specifically perform their obligations pursuant to the agreement so that title to the ASD Note and control over ASD passes as provided for in the agreement.

**FOURTH CLAIM**
(Fraud against Schlesinger and Lipschitz by CPV)

142.      Plaintiffs incorporate by reference all of the preceding paragraphs as if more fully set forth herein.

143.      Schlesinger and Lipschitz made multiple untrue representations in their agreement with CPV.

144.      These misrepresentations included at least the following:

   a.   Schlesinger and Lipshutz were the sole shareholders, officers and directors of ASD Inc.;

   b.   Schlesinger and Lipshutz were the sole Trustees of ASD;

   c.   The execution of the agreement was fully authorized by ASD Inc. and fully binding on ASD Inc.;

   d.   Schlesinger and Lipshutz had the necessary and appropriate authority to bind ASD Inc.;

   e.   There were no pending agreements, transaction or negotiations to which ASD Inc. was a party that would render the agreement with CPV or any part thereof void, voidable or unenforceable.

145.      Schlesinger and Lipschitz knew these representations were false when they made them to CPV and made them with the intent of having CPV rely upon them even though they were false.

27

146.     CPV reasonably relied upon these misrepresentations.

147.     As a result of Schlesinger and Lipschitz's fraud, CPV was injured in an amount to be determined at trial but not less than $525,000.00 plus pre- and post-judgment interest.

## **JURY DEMAND**

148.     PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

i.     Enter judgment against the Defendants on Plaintiffs' first claim in an amount to be determined at trial but no less than $3,500,000.00, treble damages, attorneys' fees and pre- and post-judgment interest;

ii.     Enter judgment against the Defendants on Plaintiff's second claim in an amount to be determined at trial but no less than $3,500,000.00, including treble damages, attorneys' fees and pre- and post-judgment interest;

iii.     Enter judgment against Schlesinger and Lipschitz on Plaintiffs' third claim ordering them to specifically perform their obligations under their agreement with CPV;

iv.     Enter judgment against Schlesinger and Lipschitz on Plaintiffs' fourth claim in an amount to be determined at trial but no less than $3,500.00, including pre- and post-judgment interest; and

v.    Any additional relief the Court deems just and proper.


Dated:  New York, New York
        September 22, 2023

                                         **REISS SHEPPE LLP**

                                         By:  Matthew Sheppe

                                         425 Madison Avenue, 19th Floor
                                         New York, New York 10017
                                         Tel: (212) 753-2424
                                         Email: msheppe@reisssheppe.com

                                         *Attorneys for Plaintiffs*